UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
UNITED STATES OF AMERICA,                              :
:
:
:
           -v-                                         :        S1 22 Cr. 56 (JPC)
:
:                OPINION AND
ROBERT SHANNON,                                        :                  ORDER
   a/k/a "Tank,"                                       :
:
                           Defendant.                  :
:
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Following a seven-day jury trial, Defendant Robert Shannon was convicted of conspiracy to distribute 400 grams or more of mixtures and substances containing a detectable amount of fentanyl and 100 grams or more of mixtures and substances containing a detectable amount of heroin, in violation of 21 U.S.C. § 846, and using and carrying a firearm during or in relation to, or possessing a firearm in furtherance of, that narcotics conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.  On August 30, 2022, Shannon moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, for a new trial pursuant to Rule 33.  *See* Dkts. 167-68; *see generally* Dkt. 169 ("Deft. Br.").  For the following reasons, Shannon's motions are denied.

## I. Background

**A.   Facts[1]**

The operative Indictment in this case charged Shannon, along with two co-Defendants, Kareem Roderique and Nikia King, with conspiracy to distribute controlled substances, specifically fentanyl, cocaine, and heroin, in violation of 21 U.S.C. § 846, Dkt. 12 ("Indictment") ¶ 1-3, and with using and carrying firearms during and in relation to, and possessing firearms in furtherance of, that drug trafficking crime, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (2), *id.* ¶ 4.  The evidence at trial established that Shannon, Roderique, and King, along with a cooperating witness (the "CW"), conducted a large-scale narcotics distribution operation out of a stash house in East Orange, New Jersey.

In October 2020, the CW, who was not yet cooperating with law enforcement, arranged to buy five kilograms of cocaine from a confidential source (the "CS") who was working with law enforcement at the time.  Tr. at 57-63, 474-77.  The transaction was to be primarily financed by Roderique.  *Id.* at 475-81.  The CW and the CS met twice in Manhattan to plan the deal.  *Id.* at 474-76.  Then, on October 27, 2020, the CS traveled under the supervision of law enforcement to a Burger King in the Bronx, the location where the CS told the CW to meet him for the drug transaction.  *Id.* at 68-71, 481, 484.  The CW and Roderique drove together to the Burger King.  *Id.* at 71, 482-84.  After arriving, the CW showed the CS the money for the expected drug purchase, and the CW received sham cocaine from an undercover law enforcement officer.  *Id.* at 74-75, 485-87.  The CW and Roderique were then placed under arrest, *id.* at 75, 488-89, and law

---

[1] The following facts are drawn from the testimony and exhibits presented at trial.  *See United States v. Dore*, No. 12 Cr. 45 (RJS), 2013 WL 3965281, at *1 n.1 (S.D.N.Y. July 31, 2013).  The transcript from the trial, Dkts. 153-66, is cited as "Tr." and the exhibits received in evidence at trial are cited as "Exh." herein.

enforcement seized large quantities of cash and cutting agent from their vehicle, *id.* at 76-81; *see also* Exhs. 205H, 205L, 205N-P.

The CW expressed an interest in cooperating shortly after his arrest. Tr. at 81-82, 275-76, 493-94. He informed law enforcement that in addition to Roderique, he was working with Shannon and King, that their narcotics operation was based in a stash house located in East Orange, New Jersey, and that large quantities of narcotics and firearms were stored at that location. *Id.* at 81-84, 493-98. Law enforcement then transported the CW to the vicinity of the East Orange stash house. *Id.* at 500, 505. Prior to the CW's arrest and while the CW was in the Bronx, Shannon called him asking for fifty grams of fentanyl, *id.* at 499, that Shannon intended to sell to his own customers, *id.* at 500 ("[Shannon] had his own personal sales that he sold, people waiting, and so he was going to make a sale."). On the way to New Jersey with law enforcement, the CW received another call from Shannon, during which Shannon asked the CW about the location of certain bricks of heroin. *Id.* at 502. The CW then tried to stall Shannon so he would not leave the stash house until law enforcement arrived. *Id.* at 502-03.

Upon their arrival, law enforcement observed Shannon exit the stash house, holding a black bag. *Id.* at 86-87. Shannon then went into a car, at which point law enforcement approached the vehicle, placed Shannon under arrest, and seized the black bag which contained "a large amount of heroin and fentanyl." *Id.* at 87; *see also id.* at 86-87, 90-92, 280-83; Exhs. 203A, 1201. Later that night, law enforcement conducted a search of the stash house and seized, *inter alia*, large quantities of fentanyl, heroin (including black tar heroin), cutting agent, cash, and other drug paraphernalia such as a "kilo press," box fans, respirator masks, "various types of blenders," strainers, and cookie sheets, which are "all items commonly used in a stash house." Tr. at 285-302; *see also* Exhs. 201C-K, 201M-P, 201U-V, 202A-C, 202K. The CW would travel with

Shannon to a smoke shop in the West Village of Manhattan to buy supplies for their narcotics operation, including cutting agent, and Shannon communicated with that smoke shop via text messages and phone calls. *See* Tr. at 421-24, 426, 754-68; Exhs. 207A-B, 300A-4, 1207, 1210. Security camera footage shows Shannon entering or exiting the stash house at least fifteen times in the several weeks leading up to his arrest. Tr. at 287; Exhs. 801, 816, 824, 858, 861-62, 865, 869-72, 874, 876, 880, 882.

In addition to drugs and drug paraphernalia, also recovered from the East Orange stash house were two firearms. Tr. at 302-10; Exhs. 201Q-T, 1001-02. The CW explained at trial that the landlord of the stash house had previously stored about seven firearms, including the two ultimately recovered by law enforcement, in a bag in a back room of that house. Tr. at 466-67. In October 2020, the landlord asked the CW to hold on to the firearms. *Id.* Although the CW protested at first, he ultimately took two of the guns and gave them to Shannon and King. *Id.* at 467-68. Shannon and King continued to store these loaded firearms in the stash house, as protection in the event of, for example, a robbery. *Id.* at 468-69, 471-72; Exhs. 201Q-R; *see also* Tr. at 472 (the CW explaining that "[y]ou can't call the police and say you w[ere] robbed for drugs").

**B.     Procedural History**

The Government's proof at trial consisted of testimony from two law enforcement officers, the CW, and a paralegal specialist from the U.S. Attorney's Office, as well as numerous exhibits. At the close of the Government's case, the defense moved for a judgment of acquittal pursuant to Rule 29 arguing that "the [G]overnment . . . failed to present enough evidence for the matter to go and proceed for a jury deliberation." Tr. at 781. The Court denied the motion, finding sufficient evidence to establish both Shannon's participation in the narcotics distribution conspiracy charged

in Count One and his commission of the firearms offense charged in Count Two, based on, among other things, the CW's testimony regarding the existence of the conspiracy to distribute fentanyl, heroin, and cocaine; surveillance videos from the East Orange stash house; the drugs and firearms seized by law enforcement; the evidence of Shannon's access to the stash house; and the CW's testimony as to the purpose of the firearms. *Id.* at 782-83. The defense did not put on a case. *Id.* at 788. On August 15, 2022, the parties delivered closing arguments, *id.* at 811-900, and, after receiving the Court's jury charge, *id.* at 912-71, the jury retired to deliberate at approximately 3:58 p.m. that day, *id.* at 972.

The jury deliberated until shortly after 5:00 p.m. on August 15, 2022, *id.* at 975, and resumed deliberations the next day at approximately 10:10 a.m., *id.* at 979. At approximately 11:00 a.m., the Court received a note from the jury (the "Jury Note"), which read, "If we can't reach a unanimous verdict, what happens next for all of us?" *Id.* at 980; Court Exh. 2. The Court marked the Jury Note as Court Exhibit 2, read the note to the parties in open court, and solicited suggestions as to the proper response. Tr. at 980-90. The Court overruled an objection from the defense to include a reference to the concept of a mistrial. *Id.* at 987. Instead, after previewing its response for the parties, the Court instructed the jury as follows:

> [W]hat happens if, after your deliberations, you are not able to reach a unanimous verdict, what that would mean for you is not a matter that you should be concerned with. Your concern should be, as you consider the evidence and the applicable law, whether, as to each count, the prosecution has proved each element beyond a reasonable doubt, and any verdict that you render as to a count must be unanimous.

*Id.* at 990. The Court additionally reiterated its previous instructions on the reasonable doubt standard and concluded its response by noting:

> Now, this was a week-long trial. You have only been deliberating for about an hour yesterday, if I remember correctly, and probably – and I believe less than an hour today before I received your note. So I am going to ask you to go back, continue to consider the evidence, continue to consider my instructions on the law, listen to each other, and continue your deliberations.

5

*Id.* at 990-91.  The jury resumed its deliberations at approximately 11:52 a.m.  *Id.* at 992.

Less than two hours later, at approximately 1:35 p.m., the Court received another note from the jury, this time reporting that it had reached a verdict.  *Id*.  The jury announced in open court a unanimous verdict convicting Shannon of both Counts.  *Id.* at 993-94.  As to Count One, the jury found that the drug distribution conspiracy involved 400 grams or more of mixtures and substances containing a detectable amount of fentanyl and 100 grams or more of mixtures and substances containing a detectable amount of heroin, but did not involve cocaine.  *Id.*  These motions followed.

## II.  Legal Standard

A.  **Federal Rule of Criminal Procedure 29**

Federal Rule of Criminal Procedure 29(a) provides that a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The Rule, however, does not provide license for a judge to "usurp[] the role of the jury.*"  United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).  The question is "not whether this court believes that the evidence at trial established guilt beyond a reasonable doubt," *United States v. Brown*, 937 F.2d 32, 35 (2d Cir. 1991), but whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (emphasis and internal quotation marks omitted).  In conducting this inquiry, the Court may not "assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence." *Dore*, 2013 WL 3965281, at *2 (citing *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).  Thus, a defendant faces "an uphill battle" and bears "a very heavy burden," as the Court must evaluate the evidence "in light most favorable to the Government, with all reasonable inferences drawn in favor of the verdict." *United States v. Crowley*, 318 F.3d 401, 407 (2d Cir. 2003) (internal quotation marks omitted).  "A judgment of

acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (brackets and internal quotation marks omitted).

**B.      Federal Rule of Criminal Procedure 33**

Rule 33(a) permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." This remedy may only be granted "sparingly and in the most extraordinary circumstances." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (internal quotation marks omitted); *see also United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021) ("It is accordingly only in exceptional circumstances, where there is a real concern that an innocent person may have been convicted, that a court may intrude upon the jury function of credibility assessment and grant a Rule 33 motion." (internal quotation marks omitted)).  Thus, "a district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *Archer,* 977 F.3d at 188 (internal quotation marks omitted). "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

### III.  Discussion

Shannon advances three principal arguments in support of his motions: *first*, that there was insufficient evidence to support a verdict that he participated in the narcotics conspiracy charged in Count One, or that he was guilty of the firearms offense charged in Count Two, Deft. Br. at 4-5; *see also id.* at 7-8 (incorporating the same arguments from the Rule 29 motion to the Rule 33 motion); *second*, that the Government failed to establish venue by a preponderance of the evidence, *id.* at 6; and *third*, that the Court erred in its response to the Jury Note thereby warranting a new trial, *id.* at 9.  The Court addresses each of these arguments in turn.

**A.     Sufficiency of the Evidence**

In assessing its sufficiency, a court considers the evidence "in the light most favorable to the government," with a defendant "bear[ing] a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient."  *United States v. Rosemond*, 841 F.3d 95, 113 (2d Cir. 2016) (internal quotation marks omitted).  As discussed below, Shannon's challenge to the sufficiency of the evidence largely entails attacking the credibility of the CW.  "Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to weight of the evidence, not to its sufficiency, and a challenge to [t]he weight is a matter for argument to the jury . . . ."  *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (alteration in original) (internal quotation marks omitted).  Thus, "the proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury," not in a motion to the judge.  *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (internal quotation marks omitted).

**1.     Count One:  The Narcotics Conspiracy Charge**

Shannon argues that the evidence presented at trial was insufficient to convict him beyond a reasonable doubt of the narcotics conspiracy in Count One because (1) the Government's case

8

was predicated solely on the CW's testimony and (2) the CW's testimony was too incredible to support a conviction beyond a reasonable doubt. Deft. Br. at 5. Neither assertion is accurate.

The elements of conspiracy to distribute, and possess with intent to distribute, narcotics in violation of 21 U.S.C. § 846 are: "(1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Barret*, 848 F.3d 524, 534 (2d Cir. 2017) (quoting *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008)). As relevant here given the verdict, the jury also needed to find beyond a reasonable doubt that the conspiracy involved 400 grams or more of fentanyl, *see* 21 U.S.C. § 841(b)(1)(A)(vi), and 100 grams or more of heroin, *see id.* § 841(b)(1)(B)(i). There must be "proof that this drug type and quantity were at least reasonably foreseeable to the co-conspirator defendant." *Barret*, 848 F.3d at 534 (quoting *United States v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006)).

As an initial matter, Shannon inaccurately describes the Government's case against him as "predicated solely on the testimony of [the CW]." Deft. Br. at 5. But even had the Government's proof just been the CW's testimony, that would be sufficient to support the jury's verdict on Count One. "The law is well established that a federal conviction may be supported by uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (internal quotation marks omitted). The CW's testimony plainly established the existence of a conspiracy to distribute narcotics, including at least 400 grams of fentanyl and at least 100 grams of heroin, and Shannon's participation in that conspiracy. *See, e.g.*, Tr. at 407-08, 411-28. For instance, the CW testified that he utilized the East Orange stash house with Shannon and others since around late July or early August 2020, that they were selling heroin and

fentanyl out of that location, and that they were selling two or three kilograms of narcotics a month. *Id.* at 411-12.

Shannon does not appear to dispute that the CW's testimony established his participation in a conspiracy to distribute narcotics, but rather, challenges the CW's credibility: "To say that [the CW] contradicted himself multiple times when subject to cross-examination is an understatement." Deft. Br. at 5. But matters of witness credibility and inconsistency in a witness's testimony are "entirely within the province of the jury," so long as the testimony is not incredible on its face. *Roman*, 870 F.2d at 72; *accord United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990). Here, the CW's testimony about the drug distribution conspiracy and Shannon's participation in it was hardly incredible on its face. *Cf. McClean v. Cnty. of Westchester*, No. 17 Civ. 4492 (CS), 2018 WL 6329420, at *15 n.20 (S.D.N.Y. Dec. 3, 2018) ("That a witness may have given inconsistent accounts or have a criminal record hardly makes that person necessarily incredible."), *aff'd sub nom McClean v. City of Mount Vernon*, 776 F. App'x 725 (2d Cir. 2019).[2]

In fact, the CW's testimony was corroborated by other evidence adduced at trial that further proved Shannon's participation in the narcotics distribution conspiracy. The Government offered

---

[2] Shannon argues that the CW should not be believed on account of surveillance footage of his wife removing a suitcase from the stash house. *See* Deft. Br. at 5, 8. Shannon speculates in his motion, *id.*, as he did at trial, Tr. at 851-53, that this suitcase contained narcotics or drug proceeds, and that the CW concealed his wife's involvement in that criminal activity. In making this argument, he levels the weighty allegation that "there are *Brady* implications created." Deft. Br. at 8. A similar allegation was made at trial. Tr. at 542. To be sure, no evidence at trial established that either the CW or his wife committed a crime when she removed a suitcase from the stash house. While Shannon speculates that the suitcase contained narcotics or illicit proceeds—perhaps not an unreasonable speculation based on its removal from a stash house—the only testimony at trial was that the suitcase contained a video game console. *Id.* at 537-40. Moreover, the video that depicted the CW's wife removing that suitcase was produced by the Government to the defense in advance of trial. *See* Deft. Br. at 8. Thus, to be clear, the Court finds no violation of *Brady v. Maryland*, 373 U.S. 83 (1963), with respect to the disclosure of this video or the CW's wife's conduct, nor does that video in any way render the CW's testimony incredible on its face.

evidence of drugs and materials used in the drug trade that were recovered from the East Orange stash house—a location which, according to the CW, Shannon utilized to sell heroin and fentanyl, Tr. at 411-12—as well as footage of Shannon repeatedly entering and exiting that location, Exhs. 801, 816, 824, 858, 861-62, 865, 869-72, 874, 876, 880, 882.  In particular, the Government offered video of Shannon exiting the stash house on the night of his arrest holding a large black bag, Exh. 824—a bag which contained almost 100 grams of substances containing fentanyl packaged in small clear bags, Exh. 203A—and of Shannon placing the bag in his car, Exh. 849.  The Government also offered photographs depicting the bag in Shannon's vehicle, as well as the contents of the bag.  Exhs. 203A-B.  Special Agent Todd Riley, who was present on the scene, similarly testified that Shannon exited the vicinity of the stash house carrying the bag, and entered his vehicle, at which point Shannon was arrested.  Tr. at 86-87.  Special Agent Riley explained that the bag contained "thousands of glassines" that were "individual package[es] of heroin and fentanyl."  *Id.* at 90; *accord* Exh. 1201 ¶¶ 3.a-b (stipulation that over ninety-six grams of "powdery substances" containing fentanyl were recovered from Shannon's car).

Shannon acknowledges that "the government presented a solid case on the approximately 96 grams of fentanyl seized from [his] vehicle on October 27, 2022," but argues that "those facts alone do not a conspiracy make."  Deft. Br. at 4.  The evidence supporting a conspiracy conviction must "tend[] to show knowing participation . . . *i.e.*, facts sufficient to draw a logical and convincing connection between circumstantial evidence of an agreement, and the inference that an agreement was in fact made."  *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (internal quotation marks and citations omitted).  But "[t]he Second Circuit has 'frequently noted that "one who deals in large quantities of narcotics may be presumed to know that he is a part of a venture which extends beyond his individual participation."'"  *United States v. Valencia*, 226 F. Supp. 2d

503, 510-11 (S.D.N.Y. 2002) (quoting *United States v. Murray*, 618 F.2d 892, 902 (2d Cir. 1980)), *aff'd*, 100 F. App'x 17 (2d Cir. 2004).  Here, Shannon was arrested in possession of almost 100 grams of powdery substances containing fentanyl, almost half of which was packaged in small bags, while exiting a location that housed almost seven kilograms of fentanyl and heroin and various materials used to prepare narcotics for distribution.  Tr. 86-87, 90-92, 96-102; Exhs. 203A, 1201; *see Valencia*, 226 F. Supp. 2d at 512 (evidence of the defendant possessing approximately one kilogram of cocaine was sufficient to establish conspiracy rather than an isolated drug transaction in part because "[t]hese are not personal use quantities" thereby indicating an intent to further distribute).  As Special Agent Riley testified, the drugs that Shannon possessed were "not an individual amount of heroin and fentanyl" and were "packaged for sale."  Tr. at 92; *see also id.* at 91-92 ("Each one of those small bags is one dosage unit, so even if you have a highly dependent, very seriously addicted person, you can only go through, I don't know, ten, twenty of those bags."). While Shannon tries to dismiss Special Agent Riley's testimony as "wildly inconsistent on basic facts," Deft. Br. at 4, the Court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony," *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) (internal quotation marks omitted).

Accordingly, the evidence was more than sufficient to support Shannon's conviction of the narcotics distribution conspiracy in Count One.

### 2.     Count Two:  The Firearms Charge

The evidence also was sufficient to support Shannon's conviction of the firearms offense in Count Two.  Title 18, United States Code, Section 924(c)(1)(A), in relevant part, makes it a crime if someone, "during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or . . . in furtherance of any such crime, possesses a firearm."  The elements of Count Two are (1) Shannon committed

12

a drug trafficking crime, *i.e.*, the offense charged in Count One, (2) Shannon knowingly used, carried, or possessed a firearm or aided and abetted the use, carrying, or possession of a firearm, and (3) Shannon used or carried the firearm during or in relation to, or possessed a firearm in furtherance of, the drug trafficking crime, or aided and abetted the same. "Section 924(c) requires the government to establish a 'nexus' between the charged firearm and the charged drug selling operation." *United States v. Willis*, 14 F.4th 170, 184 (2d Cir. 2021). A "nexus is established where the firearm afforded some advantage (actual or potential, real or contingent) to the drug trafficking"—*e.g.*, "where the charged weapon is readily accessible to protect drugs, drug proceeds, or the dealer himself." *Id.*; *see also United States v. Bimbow*, No. 21 Cr. 48 (JPO), 2022 WL 1617490, at *2 (S.D.N.Y. May 23, 2022).

Shannon argues that the CW's testimony as to the firearms offense was "equally incredible" such that the evidence was insufficient to support his conviction. Deft. Br. at 5. As discussed, the CW's testimony was not incredible on its face, and the evaluation of his credibility and any inconsistencies in his testimony was within the province of the jury alone. Here, the CW testified that Shannon and King knowingly kept two firearms in the stash house for protection in the event of, for example, a robbery. Tr. at 467-68, 471-72. The jury was entitled to credit this testimony and convict Shannon of Count Two on this basis alone. The trial evidence also included photographs from the stash house showing the firearms in close proximity to large quantities of narcotics. Tr. at 302; Exhs. 201Q-R. "[T]he combination of drugs and tools of the drug trade in the [stash house] . . . provide[s] adequate support for the jury's verdict that the firearms were used in furtherance of drug trafficking." *Willis*, 14 F.4th at 184-85[3]; *see Bimbow*, 2022 WL 1617490,

---

[3] While the court in *Willis* additionally noted the fact that the defendant lived elsewhere, this was primarily meant to rebut the defendant's argument that "he could have possessed the

at *3 (concluding "that the evidence established at trial is sufficient to sustain [the defendant]'s conviction on the Section 924(c) count" where "several guns were found in the garage of [the defendant]'s apartment where he admittedly possessed drugs and where the evidence established that he was cutting and packaging drugs" (citation omitted)). And as noted, the evidence included testimony from the CW that Shannon worked out of the stash house in furtherance of their drug distribution conspiracy, Tr. at 411-12, as well as surveillance footage of Shannon coming or going from the stash house over a dozen times within the span of several weeks, Exhs. 801, 816, 824, 858, 861-62, 865, 869-72, 874, 876, 880, 882.

The evidence was therefore sufficient to support a conviction of the firearms charge in Count Two.

**B.  Venue**

Shannon additionally argues that the evidence at trial was insufficient to establish venue in the Southern District of New York. "Venue for a conspiracy charge lies in any district in which an act in furtherance of the charged conspiracy took place, as long as it was 'reasonably foreseeable' to the defendant that the act would take place in that district." *Bimbow*, 2022 WL 1617490, at *3 (citing *United States v. Tang Yuk*, 885 F.3d 57, 68-70 (2d Cir. 2018)).[4] "Because venue is not an element of the crime, the government must prove its propriety by only a preponderance of the evidence." *Tang Yuk*, 885 F.3d at 71.

---

weapons for purposes other than drug trafficking." *Willis*, 14 F.4th at 184. Shannon made no such argument at trial and, in any event, such an argument would have been inconsistent with the CW's testimony, which the Court views in the light most favorable to the Government at this stage.

[4] Venue over the drug trafficking offense in Count One sufficiently establishes venue for the firearms offense in Count Two. *See, e.g.*, *United States v. Rodriguez-Moreno*, 526 U.S. 275, 282 (1999) ("Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c) offense.").

While the base of operations for the narcotics conspiracy was in New Jersey, the evidence established multiple actions taken in furtherance of the conspiracy in the Southern District of New York. First, the CW testified that he and Shannon would travel to Manhattan to purchase drug packaging supplies for their trafficking operation, such as cutting agent, from a smoke shop in the West Village. Tr. at 421-24, 426. Shannon's criticism of this conduct as a "flimsy connection [that] cannot be the sole source of the evidence placing venue in the Southern District of New York," Deft. Br. at 6, is unavailing. *See Bimbow*, 2022 WL 1617490, at *3 (finding venue in the Southern District proper where, *inter alia*, "CW-1 testified that he bought drug paraphernalia, including glassines, and other ingredients for his 'cut' of heroin from a smoke shop on West 8th Street in lower Manhattan"). Shannon's travel to the Southern District of New York to make these supply runs for the drug trafficking operation was, by itself, sufficient for the jury to find venue in this District.

But there was more evidence establishing venue. For instance, the CW testified that Shannon called him about procuring fentanyl while the CW was in the Bronx. Tr. at 499-500. The defense attempts to diminish the importance of this call, arguing that the "more important call" between the CW and Shannon was made while both were in the District of New Jersey. Deft. Br. at 6. The venue inquiry does not consider the relative importance of any predicate phone calls, however, but rather whether the call "further[ed] the ends of the conspiracy." *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (rejecting the argument that the individual being called need be a coconspirator for a phone call to establish venue). Shannon also made phone calls and sent text messages to the owner of the West Village smoke shop, with the text messages inquiring about the store's hours of operation. Tr. at 754-68; Exhs. 300A-4, 1207, 1210. Shannon's discussion of drug deals with a coconspirator who was in the Bronx, and his communications with

15

a smoke shop in Manhattan where he obtained supplies for his narcotics distribution operation, including about the store's operating hours, furthered the conspiracy.

Accordingly, there was sufficient evidence to establish venue in the Southern District of New York by a preponderance of the evidence.

**C.      Response to the Jury Note**

Shannon's final argument is that the Court erred in responding to the Jury Note, which asked: "If we can't reach a unanimous verdict, what happens next for all of us?" *See* Tr. at 980; Court Exh. 2. Shannon maintains that the Court should have instructed the jury that if they were unable to reach a unanimous verdict, the Court would be obliged to declare a mistrial. *See* Deft. Br. at 9 ("We feel that if the jury understood that a hung jury was a perfectly permissible outcome that they may have stood their ground."). Instead, the Court instructed the jury that they should not be concerned with what would happen in the event they cannot reach a unanimous verdict and urged the jury to continue deliberating. Tr. at 990-91.

While Shannon does not appear to challenge the procedure undertaken by the Court in receiving and responding to the Jury Note, the Court notes that the proper procedure was employed. After the Jury Note was received, it was "marked as a court exhibit and . . . read into the record in the presence of counsel and the defendant." *United States v. Ronder*, 639 F.2d 931, 934 (2d Cir. 1981). The Court afforded counsel "an opportunity to suggest appropriate responses," and then "inform[ed] counsel of the substance of his proposed response." *Id.* Finally, after the jury was recalled, the Court began by reading the Jury Note into the record and then proceeded to give the response it had previously discussed with counsel. *Id.*

Turning to the substance of its response, the Court disagrees with Shannon that "it was error not to explain to the jury what happens should they fail to reach a unanimous verdict." Deft.

16

Br. at 9. First, Shannon has identified no authority for the proposition that the Court was required to respond to the question in a particular manner—*i.e.*, by explaining to the jury the concept of a mistrial. To the contrary, "a trial court 'enjoys considerable discretion in construing the scope of a jury inquiry and in framing a response tailored to the inquiry.'" *United States v. Yeagley*, Nos. 13 Civ. 2561 (KMK), 08 Cr. 707 (KMK), 2017 WL 76903, at *6 (S.D.N.Y. Jan. 3, 2017) (quoting *United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007)); *cf. United States v. Young*, 140 F.3d 453, 456 (2d Cir. 1998) ("A readback of portions of the trial record is a matter committed to the sound exercise of a trial court's discretion . . . ."); *Parker*, 903 F.2d at 101 ("The trial judge . . . has considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion.").

Here, the Court instructed the jury that they should not be concerned with what would happen in the event they were unable to reach a unanimous verdict, and, after noting that the jury had "only been deliberating for about an hour yesterday . . . and . . . less than an hour today," urged the jury to "go back, continue to consider the evidence, continue to consider my instructions on the law, listen to each other, and continue your deliberations." Tr. at 991. The Court is unaware of any authority suggesting that informing the jury that its failure to reach a verdict would result in a mistrial, particularly at such an early stage of deliberations, was required. *Cf. Young*, 140 F.3d at 456 (failure to comply directly with a request from the jury not "prejudicial error requiring reversal").

A related question is whether the Court's response was "improperly coercive 'in its context and under all the circumstances.'" *United States v. McDonald*, 825 F. Supp. 2d 472, 479 (S.D.N.Y.

2011) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988)), *aff'd*, 759 F.3d 220 (2014).[5] This inquiry is typically conducted in the context of "*Allen* charges"—"supplemental instructions given to a deadlocked jury urging them to continue deliberating and for the jurors in the minority to listen to the majority's arguments and ask themselves whether their own views were reasonable under the circumstances." *Spears v. Greiner*, 459 F.3d 200, 204-05 (2d Cir. 2006) (citing *Allen v. United States*, 164 U.S. 492, 501 (1896)). "The propriety of an *Allen*-type charge hinges on whether it tends to coerce undecided jurors into reaching a verdict, for example when jurors are encouraged to abandon, without any principled reason, doubts that any jurors conscientiously holds as to a defendant's guilt." *McDonald*, 825 F. Supp. 2d at 479 (internal quotation marks omitted). The Court's response to the jury's question in this case, however, was not an *Allen*-type charge, but rather was "simply a request to the jurors to continue deliberations to see whether a unanimous

---

[5] The Court notes that, while the defense objected to the Court not advising the jury that, if they could not reach a verdict, there would be a mistrial and therefore the case would need to be tried again, the defense endorsed the Court's language urging the jury to continue deliberating. *See* Tr. at 982 ("I have no issue of something of that nature, 'go back and try' type of language . . . ."); *see also id.* at 987 ("I like what your Honor wrote and I'm fine with that language, but I, just for the record, wanted to answer the specific question given, but I have already said that."). Nor did the defense object at trial to the Court's proposed instruction as improperly coercive. *See generally id.* at 982-90. The defense's objection to the Court's proposed response was, because "they asked a direct question, . . . I think it should be a direct answer," and the Court therefore should have explained that a hung jury would result, which would mean that "the case would be tried again at some point in the future." *Id.* at 982-83; *see also id.* at 984 ("[The jury] asked the question, and I think the question should be answered. And I think if we don't answer the question, it is sort of misleading and, secondly, could result in us being back here five minutes later with something to the effect of 'we asked you a question and you didn't answer it.'"). By accepting part of the Court's proposed response before it was delivered, Shannon has waived his right to later challenge that portion of the response. *See United States v. Williams*, 482 F. App'x 615, 617 (2d Cir. 2012) ("[B]ecause . . . counsel explicitly accepted the court's proposed instruction before it was given, he has waived his right to challenge that instruction on appeal." (citing *United States v. Polouizzi*, 564 F.3d 142, 153 (2d Cir. 2009)). Of course, Shannon preserved his right to challenge the Court's failure to advise the jury as to what would happen if they cannot reach a unanimous verdict—a challenge that is rejected for the reasons discussed herein. Nonetheless, the Court additionally addresses why its response to the Jury Note was not improperly coercive.

verdict could be reached." *Id.*; *see also Spears*, 459 F.3d at 204 (noting that "courts have held that a judge's simple request that the jury continue deliberating, especially when unaware of the composition of the jury's nascent verdict can not be properly considered an *Allen* charge" (internal quotation marks omitted)). But "[r]egardless of how the charge in this case is characterized," the Court must "still analyze it for any coercive effects . . . in its context and under all the circumstances." *Spears*, 459 F.3d at 204 n.3.

The language of the Court's response "itself was mild, and completely neutral as to whether the jury should or would reach a verdict." *McDonald*, 825 F. Supp. 2d at 482 (holding that a judge's instruction that "I will send you back to continue to deliberate to see whether you can reach a unanimous verdict, in light of all the instructions that I have given you" was not improperly coercive). Nor could the language have possibly "been interpreted by the jury as indicating any preference for either side." *United States v. Rao*, 394 F.2d 354, 356 (2d Cir. 1968). In fact, the response was quite similar to that given by the district court in *Spears*, and affirmed by the Second Circuit. 459 F.3d at 202 (finding that it was not improperly coercive for the judge to respond: "You have just barely begun your deliberations. We spent a good deal of time in selecting the jury and hearing the testimony. Please give it your full attention. I have a very strong feeling that you should be able to reach a verdict.").

Noting that "[l]ess than three hours transpired between the Court's instruction and the verdict," Shannon argues that "[i]t would appear that only a handful of jurors, at best, were on the fence in the morning" and those jurors might have changed their votes "just to get it over with" whereas they might otherwise have "stood their ground." Deft. Br. at 9. The Court disagrees.

First, "[w]hile the courts have not identified a bright line that establishes a threshold of deliberation time that takes a case beyond the point of coercion, the courts have routinely held that

a jury's verdict that follows a supplemental instruction by at least two to three hours suggests the absence of coercion." *Yeagley*, 2017 WL 76903, at *7. Here, the jury deliberated for just under two additional hours after having deliberated for approximately the same length of time prior to sending the Jury Note. *See McDonald*, 825 F. Supp. 2d at 483 (noting that the "jury deliberated for at least an hour after the supplemental instruction," which "was a significant amount of time because the jury here had deliberated for less than four hours in total before it rendered its initial, nonunanimous verdict and received the subsequent supplemental instruction" and thus "support[ed] the non-coercive nature of the instruction to continue to deliberate"). Second, nothing in the Jury Note, apart from the jurors' inquiry about what would happen to them if they could not reach a unanimous verdict, indicated that the jury was in fact deadlocked, or even that some jurors may have been "on the fence." In fact, it was for this precise reason that the Court noted that a formal *Allen*-type charge would have been premature. Tr. at 983.

Accordingly, the Court denies Shannon's request for a new trial on the basis of its response to the Jury Note.

### IV. Conclusion

For the foregoing reasons, Shannon's motion for a judgment of acquittal pursuant to Rule 29 and his motion for a new trial pursuant to Rule 33 are denied. The Clerk of Court is respectfully directed to close Docket Numbers 167 and 168.

SO ORDERED.

Dated: December 11, 2022
      New York, New York

                                                 JOHN P. CRONAN
                                          United States District Judge